FILED

2018 MAR 22 P 2: 0

SUSAN Y. SOONG
CLERK, US DISTRICT COURT
NO. DIST. OF CA.

SEALED
BY COURT ORDER

JCS

1   **KESSELMAN BRANTLY STOCKINGER LLP**
     David W. Kesselman (State Bar No. 203838)
2    *dkesselman@kbslaw.com*
     Amy T. Brantly (State Bar No. 210893)
3    *abrantly@kbslaw.com*
     Majed Dakak (State Bar No. 271875)
4    *mdakak@kbslaw.com*
     Mark Paluch (State Bar No. 229202)
5    *mpaluch@kbslaw.com*
     1230 Rosecrans Avenue, Suite 690
6    Manhattan Beach, CA 90266
     Telephone:    (310) 307-4555
7    Facsimile:    (310) 307-4570
8
     **MOGINRUBIN LLP**
9    Daniel J. Mogin (State Bar No.  95624)
     *dmogin@moginrubin.com*
10   Jennifer M. Oliver (State Bar No. 311196)
     *joliver@moginrubin.com*
11   600 West Broadway, Suite 3300
     San Diego, CA 92101
12   Telephone:    (619) 687-6611
     Facsimile:    (619) 687-6610
13
14   *Attorneys for Relator GREGORY J. DUNCAN, M.D.*
15
16                    **UNITED STATES DISTRICT COURT**
17                  **NORTHERN DISTRICT OF CALIFORNIA**
18
19   UNITED STATES OF AMERICA AND          Case No.:
     STATE OF CALIFORNIA *ex rel.* GREGORY
20   J. DUNCAN, M.D.,                      CV 18    1783
                                           **COMPLAINT**
21                            Plaintiff,
                                           **FILED UNDER SEAL PURSUANT TO**
22         v.                              **31 U.S.C. § 3730(b)(2)**
23   ENVISION HEALTHCARE CORP., a          **DEMAND FOR JURY TRIAL**
     Delaware corporation; EMCARE HOLDINGS,
24   INC., a Delaware corporation; EMCARE INC.,
     a Delaware corporation; and
25   REIMBURSEMENT TECHNOLOGIES, INC.,
     a Pennsylvania corporation.
26
27                            Defendants.
28

Qui Tam Plaintiff Gregory J. Duncan, M.D. ("Dr. Duncan" or "Relator"), demanding trial by jury, files this complaint against EMCARE HOLDINGS, INC., EMCARE, INC., (collectively, "EmCare"), REIMBURSEMENT TECHNOLOGIES, INC. ("RTI") and ENVISION HEALTHCARE CORP. ("Envision"; collectively, EmCare, RTI and Envision are "Defendants"), and alleges:

## I.     INTRODUCTION

1.      Current Procedural Terminology ("CPT") codes are used to determine payments to healthcare providers, including payments from Real-Parties-in-Interest, the United States of America and the State of California.   CPT codes are subject to strict medical guidelines established by the American Medical Association.   This case seeks to recover hundreds of millions of dollars that Defendants, some of the country's largest medical services, outsourcing and billing companies, have unjustly extracted from Real Parties through years of systematic and false CPT upcoding and billing for emergency room ("ER") services.

2.      EmCare is wholly-owned and controlled by Envision and is a provider of outsourced medical services to more than 1,500 clinical healthcare departments in 45 states and the District of Columbia.   EmCare employs emergency room physicians, manages emergency department operations, and, through RTI, a member of its corporate family, handles or oversees emergency department billing.   According to Envision's most recent Securities and Exchange Commission ("SEC") Form 10K report, EmCare handled over 15.2 million visits to emergency rooms in 41 states in 2016 alone.

3.      Relator Dr. Gregory Duncan is an orthopedic surgeon with privileges at Sutter Coast Hospital (the "Hospital") in Crescent City, California, in the Northern District of California. Dr. Duncan has discovered that Defendants are routinely overbilling for ER visits paid for by Real Parties and systematically upcoding by applying CPT codes that are higher and therefore more expensive than the appropriate codes supported by the underlying medical record and/or the level of care provided.   This systematic upcoding is performed not by doctors, but by Defendants' coders housed in a remote location.   Defendants also attempt to conceal their fraudulent upcoding scheme from patients and insurers through an opaque web of billing aliases and shell entities.

4.      Dr. Duncan first suspected the Defendants were systemically overbilling when dozens of patients approached him with concerns about bills they had received after undergoing ER care at the Hospital. Most of these patients were treated by a doctor or physician assistant for fifteen minutes or less for minor issues, yet were coded and billed as if they had received extensive care for a life-threatening emergency. With these patients' consent, and at their urging, Dr. Duncan examined bills and medical records. He also considered patient and witness accounts which revealed that the Defendants routinely bill patients for a higher and more expensive level of treatment than is supported by the underlying medical record.

5.      Shocked by this discovery, Dr. Duncan consulted fellow physicians at the Hospital, including some employed by EmCare, all of whom expressed similar concerns and frustrations. The EmCare-employed physicians also informed Dr. Duncan they do not assign billing codes. Rather, codes are assigned remotely by EmCare or members of its corporate family, including RTI.

6.      Dr. Duncan has since developed evidence to show that Defendants' systemic upcoding damages Real Parties, including through the Centers for Medicare and Medicaid Services ("CMS") and the Medi-Cal program. Through his investigation, Dr. Duncan discovered that Defendants' overbilling has gone on for years, and is a widespread practice that Plaintiff believes has resulted in hundreds of millions of dollars in overpayments from Real Parties.

## II.    JURISDICTION AND VENUE

7.      This is a civil action by Relator, acting on behalf of and in the name of the United States and the State of California, against Defendants under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and the California False Claims Act, Cal. Govt. Code §12650 et seq. ("CFCA"). This Court has jurisdiction over the Relator's FCA claims pursuant to 28 U.S.C. § 1331 and § 1345, and 31 U.S.C. § 3732(a). This Court has subject matter and supplemental jurisdiction over the Relator's CFCA claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

8.      Venue is proper because a suit under the FCA "may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be

1  found, resides, transacts business, or in which any act proscribed by [the FCA] occurred." 31

2  U.S.C. § 3732(a). Defendants both conduct business in and have committed violations of the

3  FCA and CFCA within this judicial district. Therefore, this Court has personal jurisdiction over

4  the Defendants, and venue is appropriate in this district. 31 U.S.C. § 3732(a).

5  **III.    PARTIES**

6       9.      Relator Gregory J. Duncan, M.D. received his medical degree from the Johns

7  Hopkins University School of Medicine, completed his orthopedic residency training at UCLA

8  Medical Center, and completed fellowship training in hand and upper extremity surgery at the

9  University of New Mexico. Dr. Duncan resides in Crescent City, California, where he has been

10  a practicing orthopedic surgeon with hospital privileges at Sutter Coast Hospital for 25 years. Dr.

11  Duncan is the chief of the surgery department, former chief of the medical staff and a former

12  board member of Sutter Coast Hospital. He is also the Chair of the Del Norte Healthcare District

13  Board, a California special district board elected by county residents to address local healthcare

14  needs.

15       10.     Real-Party-in-Interest the United States of America, acting through CMS, oversees

16  the federal Medicare and Medicaid programs, under which health care providers, including

17  hospitals and physicians, are paid with federal funds for providing care to enrolled patients.

18       11.     Real Party-in-Interest the State of California co-funds the Medi-Cal program with

19  the United States of America, acting through CMS, under which healthcare providers, including

20  hospitals and physicians, are paid with federal and state funds for providing care to enrolled

21  patients.

22       12.     Defendant Envision Healthcare Corp. is incorporated in the State of Delaware with

23  its corporate headquarters located at 1A Burton Hills Boulevard in Nashville, Tennessee, and is

24  registered to do business and is conducting business in the State of California. Defendant

25  Envision Healthcare Corp. is the parent company of Defendants EmCare Holdings, Inc., EmCare,

26  Inc., and Reimbursement Technologies, Inc.

27       13.     Defendant EmCare Holdings, Inc. is incorporated in the State of Delaware with its

28  corporate headquarters at 13737 Noel Road, Suite 1600 in Dallas, Texas. Defendant EmCare

1  Holdings, Inc. is a wholly-owned subsidiary of Envision Healthcare Corp.  Defendant EmCare

2  Holdings, Inc. has not registered with the California Secretary of State to do business in the State,

3  but is conducting business in California and is therefore in violation of California Corporations

4  Code 2105(a).

5        14.      Defendant EmCare, Inc. is incorporated in the State of Delaware, also with its

6  corporate headquarters at 13737 Noel Road, Suite 1600 in Dallas, Texas, and is registered to do

7  business and is conducting business in the State of California, including in the Northern District

8  of California.  Defendant EmCare, Inc. is a wholly-owned subsidiary of Envision Healthcare

9  Corp.

10        15.      Defendant Reimbursement Technologies, Inc. is incorporated in the State of

11  Pennsylvania, and maintains its corporate headquarters at 13737 Noel Road, Suite 1600 in Dallas,

12  Texas.  Defendant RTI has not registered with the California Secretary of State to do business in

13  the State, but is conducting business in California and is therefore in violation of California

14  Corporations Code 2105(a).  Defendant RTI is a wholly-owned subsidiary of Envision acting in

15  concert with and controlled by EmCare.  EmCare states that RTI is "EmCare's wholly owned

16  billing and practice-management services provider, focused on emergency medicine and hospital

17  medicine reimbursement services."  https://www.emcare.com/about/affiliates.  According to the

18  company's website, RTI codes patient visits and bills payors by "abstracting" emergency

19  department and hospitalist charts to break out billable procedures, diagnoses, and other relevant

20  data.   www.reimbtech.com/services.aspx.   The site also claims that "RTI's facility coding

21  package ensures consistency and compliance in the emergency room, along with accurate revenue

22  generation," and that "once RTI began to manage [one Florida hospital's] billing and coding, its

23  facility coding charges increased by 47%."  www.reimbtech.com/success-stories.aspx.

24        16.      "Defendant" or "Defendants" as used herein, includes, in addition to those named

25  specifically above, the named Defendants' predecessors, including those merged with, or

26  acquired by the named Defendants and each named Defendants' wholly-owned or controlled

27  subsidiaries, divisions or affiliates that provided or billed Real Parties for emergency room

28  services during the relevant period.

## IV.  ALLEGATIONS

17.   In 2012, Dr. Duncan commenced a two-year term as Chief of Staff at Sutter Coast Hospital and *ex officio* member of the Hospital's Board of Directors.  While serving on the Board, Dr. Duncan regularly fielded complaints from patients about their bills.  His patient advocacy and contributions to blogs and newsletters addressing patient concerns soon earned Dr. Duncan a reputation as a champion of patient rights and crusader against overbilling.  As a result, Dr. Duncan continued to hear from Hospital patients with billing concerns even after his term as Chief of Staff was completed and he was no longer on the Hospital Board.

18.   Once EmCare assumed responsibility for the Hospital's emergency room physician services during the summer of 2015, patient complaints to Dr. Duncan about ER bills markedly increased in frequency.

19.   At the request of and with the express authorization of certain patients, Dr. Duncan examined their medical bills and records.  Dr. Duncan discovered that Defendants' bills regularly contained material misrepresentations, *e.g.*, that the patient had been treated by a physician, when the patient had only seen a nurse practitioner, physician assistant, or other non-physician.  Even more alarming, however, was Dr. Duncan's discovery that Defendants regularly and systematically upcode CPT codes to increase the amounts billed to patients and payors, including Real Parties.

20.   Dr. Duncan is intimately familiar with proper CPT coding and billing.  Although many doctors delegate coding and billing to a subordinate or an outside vendor, Dr. Duncan has personally performed his own CPT coding and billing for much of his career.

21.   The CPT code set is a medical coding system maintained by the American Medical Association ("AMA").   *See* https://en.wikipedia.org/ wiki/Current_Procedural_Terminology. CPT codes report medical, surgical, and diagnostic procedures and services to payors of healthcare services, including health insurance companies, state and federal entities such as Real Parties, health and welfare funds, businesses, and individuals.   The CPT codes minimize uncertainty and inconsistency, and disagreements on the appropriate code are rare.   The fee associated with each CPT code is established by the healthcare provider, though some payors,

1  such as Real Parties, cap the amount they will pay under a given CPT code.

2      22.    For instance, CMS imposes a maximum allowable payment for each CPT code,

3  which varies by year and geographical region.  CMS reimburses the provider up to 80% of the

4  allowable amount, with the remainder to be paid by the patient or other payors such as Medi-Cal.

5  ER physician services are generally coded using a range of five CPT Codes ranging from 99281

6  (for the least severe problems) to 99285 (for problems that pose an immediate risk to life or limb

7  function).

8      23.    Although the specific amounts vary a bit from year to year, in Northern California

9  from 2015 forward, CMS has allowed about $178 for a visit coded 99285, $120 for a visit coded

10  99284, $63 for a visit coded 99283, $42 for a visit coded 99282, and $22 for a visit coded 99281.

11  Each time a visit is coded one or more CPT levels above what it should have been, Real Parties

12  and others are overcharged, and upcoding by even a single CPT level can result in a bill that is

13  nearly double what it should be.  Given the significant number of patient visits that Real Parties

14  cover each year, the damages that result from systematic upcoding are believed to be in the

15  hundreds of millions of dollars.

16      24.    The CPT coding standards are clear and are meant to be applied objectively.  For

17  example, CPT standards for ER Code 99285 specify that, "[u]sually, the presenting problem(s)

18  are of high severity and pose an immediate threat to life or physiologic function."  Code 99285 is

19  only appropriate for visits requiring: "A comprehensive history; a comprehensive examination;

20  and medical decision making of high complexity."  Given the time required to perform a

21  comprehensive history and conduct a comprehensive examination, hospital visits properly coded

22  as 99285 require significant face-to-face time with a physician.  Similar objective standards exist

23  for applying codes 99284, 99283, 99282, and 99281.

24      25.    Hospitals are certified for the level of trauma care they can provide.  Sutter Coast

25  Hospital is certified as a Level IV trauma center.  Level IV is the lowest level of trauma

26  certification; patients with severe trauma are nearly always transferred to another hospital.

27  Therefore, Code 99285, which applies to conditions presenting an immediate risk to life or limb

28  function, should rarely be applied to bills for patients who were either admitted to the Hospital or

1    sent home from the ER. Prior to EmCare's takeover of the Hospital emergency room, this was

2    true. But since EmCare's takeover in the summer of 2015, Defendants have routinely "upcoded"

3    bills using Code 99285, inflating the amounts billed to Hospital patients, Real Parties and other

4    payors.

5          26.    To date, Dr. Duncan has collected information from more than 30 individuals who

6    have approached him with concerns about bills received in the 2 ½ years since EmCare was

7    granted an exclusive contract to staff the Hospital emergency room. He has investigated these

8    complaints by interviewing the patients (as well as spouses or family members who accompanied

9    the patient, when available), and generally reviewing the patients' medical bills and underlying

10   medical records. Dr. Duncan discovered that in almost every case, Defendants used improperly

11   high CPT codes to overbill the patient and/or payor.

12         27.    Defendants' false billing is not limited to the use of Code 99285. Dr. Duncan has

13   also independently identified many instances in which Defendants "upcoded" to Codes 99284,

14   99283, and 99282 in place of the lower and less expensive codes that should have been applied.

15         28.    The five ER codes discussed above are not the only CPT codes misused in

16   Defendants' scheme; Defendants also upcode by improperly using "global fee" codes. Global

17   fee codes are used to bill for initial ER care, as well as a follow up treatment for a period of up to

18   90 days at no additional charge. EmCare has inappropriately applied the global fee code when

19   no follow up care was intended or provided by EmCare.

20   **DEFENDANTS SUBMIT FALSE CLAIMS FOR PAYMENT TO REAL PARTIES**

21         29.    Below are specific examples Dr. Duncan has identified in which Defendants have

22   knowingly upcoded and submitted false claims to one or both Real Parties.

23         (a)    **Patient AA1, a Medicare beneficiary:** In July 2017, AA reported being

24   seen by a nurse practitioner at the Hospital for approximately 20 minutes for dizziness. The nurse

25   practitioner contacted AA's cardiologist by phone, who recommended a new medication and

26   follow up in his clinic. AA was then released home. Defendants billed CMS for that visit using

27

28   [1] Personal Identifying Information has been removed and each patient is described only by
     initials that are not his or her own.

Code 99285.

(b)     Four days later, AA was treated for the same condition by an ER physician at Asante Rogue Regional Medical Center, a larger hospital capable of a higher level of care, where AA was admitted for further care. For the more extensive services at the regional medical center, which did not use EmCare staffing or billing, the medical center billed CMS using Code 99284.

(c)     Defendants upcoded AA's visit to Code 99285. However, AA's medical record, which is used by EmCare to determine the billing code, states that the nurse practitioner obtained a "focused history." A focused history is a feature of Codes 99283 and 99282. Code 99285 requires a comprehensive history. Yet EmCare coders ignored the statement of a focused history and upcoded AA's visit to Code 99285.

(d)     Because Defendants billed CMS using Code 99285, CMS was overbilled and overpaid Defendants for that visit.

30.    **Patient BB, a Medicare and Medi-Cal beneficiary:**

(a)     In June 2016, BB was treated for a broken wrist. According to the medical record, an EmCare physician evaluated BB, manipulated the fracture, and applied a splint. Defendants billed CMS and Medi-Cal for Patient BB's visit using Code 99285.

(b)     Because Patient BB's care required only moderate medical decision-making complexity, and there was no problem posing an "immediate significant threat to life or physiologic function," Code 99285 was improper.

(c)     Because Defendants billed for a visit upcoded to 99285, CMS was overbilled, and Defendants were overpaid.

31.    **Patient CC, a Medicare and Medi-Cal beneficiary (first visit):**

(a)     In December 2016, CC was diagnosed by a non-EmCare physician with a blood clot, then referred to the EmCare ER to begin a blood thinner. Dr. Duncan's patient interview and review of bills and records revealed that CC was not seen by an EmCare doctor in the ER, but instead was treated by a EmCare physician assistant for less than five minutes. CC was prescribed an oral blood thinner and sent home.

1          (b)     Defendants upcoded Patient CC's visit to 99285, which requires both a

2   comprehensive medical history and high medical decision-making complexity.  There was no

3   complexity in CC's evaluation because a non-EmCare physician had already established the

4   diagnosis before CC went to the ER.

5          (c)     Because Defendants billed CMS for a visit upcoded to 99285, Real Parties

6   were overbilled and overpaid Defendants for this visit.

7         32.    **Patient CC, a Medicare and Medi-Cal beneficiary (second visit):**

8          (a)     Patient CC returned to the emergency room nine days later for knee pain

9   on the opposite leg.  Again, Patient CC was seen briefly by a physician assistant rather than a

10  doctor.  CC's physical exam was normal, and CC received no treatment before being sent home.

11        (b)     Defendants billed Patient CC's second visit using Code 99283, which was

12  inappropriate because that code requires an expanded problem focused history and moderate

13  medical decision-making complexity.  Here, the level of medical decision making was low, and

14  the patient was only briefly evaluated by a physician assistant.

15        (c)     Because Defendants billed CMS for a visit upcoded to 99283, CMS was

16  overbilled and overpaid Defendants for this visit.

17       33.    **Patient DD, a Medicare and Medi-Cal beneficiary:**

18        (a)     On March 15, 2017, DD was in a minor car accident.  DD had no

19  complaints of injury, but as a precaution went to the Hospital, where DD was evaluated by an

20  EmCare provider in a folding chair in the lobby rather than in a treatment room.  The EmCare

21  provider spoke with DD, took DD's blood pressure twice, and sent DD home.  DD estimates that

22  the total time spent with the EmCare provider was only a few minutes.

23        (b)     Defendants billed CMS for DD's visit using code 99283.  Code 99283 is

24  reserved for problems of "moderate severity," but DD had no injuries.  Moreover, Code 99283 is

25  inappropriate because it requires an expanded problem focused examination, which is impossible

26  to perform in a folding chair in the hospital lobby.

27        (c)     Because Defendants overbilled CMS for a visit upcoded to 99283, CMS

28  was overbilled and CMS overpaid Defendants for this visit.

34.     **Patient EE, a Medicare and Medi-Cal beneficiary (first visit):**

(a)     EE was treated by a physician for less than 5 minutes in May 2017 for a urinary tract infection.  EE was prescribed an antibiotic and sent home.

(b)     Defendants billed CMS for EE's visit using Code 99284.  Yet, the patient described a minimal history and examination for symptoms of low to moderate severity, EE's condition was not high severity, and EE was sent home rather than admitted.  Therefore, 99284 was not appropriate.

(c)     Because Defendants billed CMS for a visit upcoded to 99284, CMS was overbilled and overpaid Defendants.

35.     **Patient EE, a Medicare and Medi-Cal beneficiary (second visit):**

(a)     The day after the above-described visit, Patient EE returned to the ER with gastrointestinal symptoms related to the antibiotic prescribed on the earlier visit.  EE's medical record shows that the EmCare provider entered the physical exam into the record exactly as it was entered the day prior; there was no focus on the presenting problem or the body system (gastrointestinal) as required for every level of CPT code.  Instead, the physical exam reflected in the medical record contains multiple irrelevant, duplicate entries identical to the prior day's exam. The patient was prescribed Lomotil for diarrhea and sent home.

(b)     Defendants upcoded this visit to Code 99284.  Contrary to standard medical coder training protocols, Defendants' trained coders used the unnecessary components of the exam to upcode the bill for EE's visit, rather than coding based on the medically necessary examination as required by the CPT system.

(c)     Because Defendants billed CMS for a visit upcoded to 99284, CMS was overbilled and overpaid Defendants on this occasion as well.

36.     **Patient FF, a Medicare beneficiary:**

(a)     On May 15, 2017, FF was evaluated at the Hospital for substernal pain, where an EmCare provider ruled out a cardiac problem, diagnosed FF with esophageal irritation, and discharged FF home.  FF reports the EmCare provider spent less than 30 minutes with him.

(b)     Defendants upcoded the bill for FF's visit to Code 99285.  Code 99285 is

11

QUI TAM COMPLAINT

1   reserved for conditions posing an immediate threat to life or physiologic function, which were
2   not present here and was therefore not appropriate.

3           (c)     Because Defendants upcoded the bill to CMS using Code 99285, CMS was
4   overbilled and overpaid Defendants for FF's visit.

5       37.     **Patient GG, a Medicare beneficiary:**

6           (a)     In July of 2017, GG was treated at the Hospital ER on two occasions for a
7   urinary catheter change, which is performed by Hospital nursing staff not employed by EmCare.
8   GG and GG's spouse report that an EmCare provider, who was not involved in the catheter
9   change, spent less than five minutes evaluating GG.

10          (b)     Defendants upcoded GG's first visit to Code 99284, and upcoded the
11  second visit to Code 99283. Based on the medical records of the first visit, a detailed history and
12  a detailed physical examination relevant to the presenting problem were not performed, nor was
13  the medical decision-making of moderate complexity as required under Code 99284. For the
14  second visit, the medical records show EmCare upcoded based on history and physical exam
15  details that were irrelevant to the presenting problem, and therefore medically unnecessary and
16  not billable. In addition, the level of medical decision making was low. Appropriate use of 99283
17  requires that the history and physical exam focus on the presenting problem, and involve moderate
18  medical decision-making complexity, none of which are present in this case.

19          (c)     Because Defendants billed CMS for the first visit at the upcoded 99284
20  payment level, CMS was overbilled and overpaid Defendants for that visit. CMS was also
21  overbilled and overpaid Defendants for GG's second visit, which was upcoded to 99283.

22      38.     **Patient HH, a Medicare beneficiary:**

23          (a)     In August 2015, HH went to the Hospital with a nose bleed after a fall. The
24  EmCare provider performed an initial evaluation and ordered blood tests, then transferred HH to
25  a hospital-based provider for overnight observation. Defendants upcoded Patient HH's bill to
26  99285, the highest level of care and payment. As discussed above, Code 99285 requires the
27  physician to collect a comprehensive medical history, perform a comprehensive examination, and
28  identify a problem posing an "immediate significant threat to life or physiologic function."

(b)     EmCare could not have provided Patient HH with the level of care needed to justify Code 99285 because Patient HH's condition posed no immediate threat to life or physiologic function and required no specific treatment.

(c)     Because Defendants billed CMS for a visit upcoded to 99285, Defendants overbilled CMS, and CMS overpaid Defendants.

## DEFENDANTS' PATTERN OF FALSE OVERBILLING IS WIDESPREAD AND AFFECTS ALL PAYORS

39.     As further illustration, Dr. Duncan has discovered that Defendants' practice is not limited to enrollees of government-sponsored healthcare programs; it is widespread and affects all types of patients and payors.  In addition to the patients described above, Dr. Duncan has also collected dozens of examples of Defendants overbilling patients who are not Medicare beneficiaries, at both the Hospital and an additional EmCare facility in neighboring Humboldt County.

40.     **Patient JJ:**

(a)     JJ approached Dr. Duncan with a billing complaint after seeking emergency care at the Hospital in August 2015 for soreness in one eye.  Patient JJ never saw a doctor during that visit and was treated only by a physician assistant for approximately 15 minutes, as confirmed by Patient JJ's spouse, who was also present throughout the evaluation.

(b)     For this visit for a minor problem, Patient JJ received a bill upcoded to Code 99284, even though JJ's condition did not require treatment by a doctor.  But Code 99284 applies where "the presenting problem(s) are of high severity and require urgent evaluation by the physician or other qualified healthcare professionals."  Code 99284 is plainly inappropriate where, as here, the problem is not high severity, and the patient was only briefly treated by a physician assistant and then released home.

41.     **Patient KK:**

(a)     KK was treated by an EmCare physician in December 2016 for a leg infection and elevated blood pressure.  According to the patient and the patient's spouse who was present during the evaluation, the physician spent about 10 minutes with the patient, then discharged him home with a prescription for antibiotics.  The patient promptly went to another

13

1   hospital (not staffed by EmCare), where he was hospitalized for treatment.

2         (b)    For the substandard care provided, Defendants upcoded KK's bill using
3   Code 99285.  Even if the care rendered had been appropriate, the brevity of the exam provided in
4   this case would not justify use of 99285.  KK was sent home by the EmCare physician, and
5   therefore, use of a billing code reserved for life or limb-threatening problems was inappropriate.

6       42.    **Patient LL:**

7         (a)    LL was seen by an EmCare physician in August 2017 for moderate
8   abdominal pain.  LL's medical record indicates that the EmCare physician performed a very brief
9   history and exam during this visit.  Importantly, before administering that exam, and without
10  explaining to LL the rationale for ordering any tests, the EmCare physician ordered a non-
11  diagnostic abdominal CT scan, and then ordered a non-diagnostic ultrasound.  The administration
12  of these diagnostic tests prior to a physical exam falls below the standard of care, is medically
13  unnecessary and inappropriate and therefore not billable, and in the case of the CT scan, exposed
14  this young patient to ionizing radiation.  Only after these tests were administered did the EmCare
15  physician perform an abdominal exam, which was normal.  By that time LL's symptoms had
16  largely resolved without treatment and the patient was released home.

17        (b)    For this substandard service, Defendants upcoded LL's bill using CPT
18  Code 99285, which is improper due to the brevity of the history and exam, and LL's self-limited
19  condition.

20      43.    **Patient MM:**

21        (a)    In late 2016, MM was treated for a fractured wrist.  According to MM and
22  MM's spouse, an EmCare physician spent less than five minutes evaluating MM before calling a
23  surgeon for further evaluation and treatment.

24        (b)    Defendants upcoded MM's bill to Code 99285.  However, 99285 was not
25  appropriate because there was no "comprehensive" history or evaluation performed, nor any
26  threat to life or physiologic function.  Rather, this visit was very brief, and only involved an
27  "expanded problem focused" physician evaluation for an issue of "low to moderate severity."

28        (c)    Patient MM was seen again at the Hospital in October 2017 for leg

swelling.   MM was seen in the emergency room hallway by a physician assistant and an ultrasound confirmed a blood clot in the leg.  The patient's spouse and daughter accompanied the patient throughout the evaluation, and report a very brief, limited examination in the hallway followed by discharge home with an oral blood thinner.

(d)      Defendants again billed MM for this visit using Code 99285, which was not the appropriate code because there was no "comprehensive" history or exam performed.

44.    **Patient NN:**

(a)      In February 2017, NN sought emergency care for low blood sugar, a relatively straightforward medical problem.  Patient NN was seen briefly by a doctor.

(b)      Patient NN received a bill from Defendants using Code 99285, the code for problems that pose an immediate risk to life or limb function.  Use of Code 99285 requires both a "comprehensive history" and a "comprehensive examination" in addition to "medical decision making of high complexity," none of which were present here.

45.    **Patient OO:**

As mentioned above, Dr. Duncan's independent investigation has also uncovered improper use of "global fee codes." For example, Patient OO was seen by an EmCare physician at the Hospital for a broken ankle. Defendants billed OO under both Code 99283 and Code 27786. The latter Code is allowed for "global" treatment extending beyond the initial evaluation and continuing for a total of 90 days. But OO's medical record documents a referral from the EmCare physician to a specialist to provide definitive care. Defendants' upcoding to Code 27786 was inappropriate because the EmCare physician did not intend to provide any additional care during the global fee period.

46.    Defendants' upcoding is likewise not limited to the Hospital.  For example, according to a study by a group of eminent economists, there is a statistically significant increase in the use of the highest level and highest cost emergency physician billing code (Code 99285), to private insurance companies when EmCare assumes responsibility for operations at an emergency care facility. Zack Cooper, Fiona Scott Morton, & Nathan Shekita, *Surprise! Out of Network Billing for Emergency Care in the United States* (Nat'l Bureau of Econ. Research,

1   Working Paper No. 23623, July 2017) (the "NBER Working Paper") at 7. Dr. Duncan has

2   confirmed these findings with respect to the Hospital, and his independent data and investigation

3   has uncovered that the scope and implications are much greater than the NBER Working Paper

4   reveals: EmCare systematically upcodes ER visits at all levels to overbill all payors, including

5   specifically Real Parties.

6       47.    Further supporting that Defendants' upcoding practice is not limited to the

7   Hospital, the two patients described below were seen at St. Joseph's Hospital, also an EmCare-

8   operated emergency room, and sought Dr. Duncan's help after receiving inflated emergency room

9   bills.

10      48.    **Patient PP:**

11          (a)    Patient PP went to the St. Joseph's Hospital Emergency room for

12  evaluation of low back pain. Patient PP already had x-rays taken elsewhere, which were normal.

13  PP asked the EmCare provider at St. Joseph's for an MRI but was told the x-rays would need to

14  be repeated. The repeat x-rays were again normal. An MRI was not performed as requested by

15  the patient. Patient PP recalls being seen by an ER physician for less than two minutes, and a

16  physician assistant for 10 to 15 minutes. For this treatment, Defendants upcoded PP's bill by

17  using Code 99284 for the patient evaluation and Code 72100 for interpretation of PP's x-ray.

18          (b)    This visit should not have been coded 99284, because (i) the patient

19  described a problem of moderate severity, and (ii) an expanded problem focused history and

20  examination, rather than a detailed history and examination, were performed. Moreover,

21  Defendants' use of Code 72100 was improper because PP's x-rays were interpreted and billed by

22  a radiologist at St. Joseph's Hospital. EmCare's bill for the same service amounts to double

23  billing.

24          (c)    Patient PP later obtained an MRI at another facility, which showed a

25  lumbar spine disk injury not visible on x-ray. Thus, Defendants not only upcoded for the

26  treatment provided to PP, but also misdiagnosed PP by failure to recommend or conduct an MRI

27  exam, then billed the patient for work performed by a non-EmCare doctor.

28

49. **Patient QQ:**

(a)      Patient QQ was seen at the St. Joseph's Hospital Emergency Room for a sore tooth. An EmCare-employed physician assistant performed a five-minute evaluation and advised QQ to see a dentist. For this visit, Defendants upcoded QQ's bill using Code 99284. 99284 was not the appropriate code because a detailed history and a detailed physical examination were not performed as required by Code 99284, the presenting problem was minor (not "high severity" as associated with 99284), decision making was straightforward (not "moderate complexity" as required by 99284), and the EmCare provider rendered no treatment other than to advise the patient to see a dentist.

## DEFENDANTS KNOWINGLY SUBMIT AND ATTEMPT TO CONCEAL FALSE CLAIMS

50.      Dr. Duncan's investigation reveals the upcoding described above is routine and widespread. The Chief of Staff and another physician at St. Joseph's Hospital in California have also reported to Dr. Duncan similar coding and billing issues in their EmCare-run emergency room department.

51.      Most of the physicians who have confirmed Dr. Duncan's findings are EmCare employees and have not complained to Defendants about the fraud due to fear of retaliation. One physician reports she did complain to EmCare about other misuse of billing codes, including submitting fraudulent claims for patient evaluations known as "Rapid Medical Evaluations" (RMEs), when in fact no evaluation had been performed. According to that physician, Defendants responded that this misconduct was not a concern because no one would be able to "prove" the fraud committed by EmCare.

52.      Disagreements on the appropriate CPT code for a medical treatment are rare, as the system minimizes uncertainty and inconsistency. Dr. Duncan's data and information show that Defendants' upcoding is neither minor nor accidental, given the clear inapplicability of the billing codes Defendants routinely apply.

53.      No one with any familiarity with the CPT coding system for emergency treatment could engage in the upcoding described herein out of ordinary negligence or an innocent mistake. Rather, such coding involves actual knowledge of the misuse of the code, or at a minimum,

17

1   deliberate ignorance or reckless disregard.

2       54.   A provider may only bill for medically necessary procedures. CMS will only pay

3   for the medically necessary portion of a beneficiary's care. Yet, as illustrated by the examples of

4   Patients CC, EE, LL, and GG above, Defendants' coders are inappropriately considering

5   unnecessary tests and exams as a basis to upcode. Upcoding based on unnecessary procedures is

6   prohibited by the CPT system and requires, at a minimum, deliberate ignorance or reckless

7   disregard on the part of the coder.

8       55.   EmCare bills patients nationwide through its affiliate, RTI. RTI is a wholly-owned

9   subsidiary   of   EmCare's   parent   company,   Defendant   Envision.

10  https://www.emcare.com/about/affiliates. RTI is a large, national medical billing company

11  providing coding services for medical facilities in dozens of states. Its officers, directors,

12  managers, and employees engaged in coding are trained on and familiar with the proper use of

13  the CPT coding system, including requirements that only medically necessary care be considered

14  in designating a CPT code. The misapplication of emergency treatment codes by RTI

15  representatives and/or employees is therefore either intentional, or the product of deliberate

16  ignorance or reckless disregard.

17      56.   Although Defendant RTI issues bills to EmCare patients under many different

18  names, EmCare's billing is centralized through RTI from a remote location. There, acting as an

19  alter ego and/or agent of EmCare (and/or their mutual parent, Envision), RTI generates

20  fraudulently upcoded bills for the patients of EmCare physicians across the country. Because

21  Defendants' nationwide coding and billing is believed to be centralized through a single entity,

22  this systematic over-billing is not limited to EmCare's operations in Crescent City or Humboldt

23  County. Rather, Defendants' false billing practices affect patients and payors nationwide,

24  including CMS (through the Medicare and Medicaid programs) and the State of California

25  (through the Medi-Cal program).

26      57.   Defendants attempt to conceal that medical coding and billing is not performed by

27  local doctors or facilities by, among other things, using numerous billing aliases and constructing

28  a confusing web of billing entities. Defendants shroud the identity of these billing entities by

using pseudonyms to create the illusion that RTI bills are from local emergency departments. For example, "Battery Point Medical Services," a billing entity whose website directs questions to EmCare and is registered to RTI, lists its "practice location" as 800 E. Washington Boulevard, the Crescent City address of Sutter Coast Hospital. But there are no offices or personnel affiliated with Battery Point Medical Services at that location. In fact, "Battery Point" is a local landmark in Crescent City, California and is widely familiar to residents there.

58.     Defendants make use of "locally inspired" corporate pseudonyms to issue billing statements to patients in other geographic locations as well. For example, a patient treated at St. Joseph Hospital in Humboldt County, California, received a bill from "Dolbeer St Medical Services." Dolbeer Street is a road in Eureka, California, and "Dolbeer St Medical Services" lists its address as 2700 Dolbeer St., Eureka, CA, which is the address for St. Joseph Hospital. However, there are no EmCare or RTI billing employees at that site.

59.     By issuing bills under names that reference a local landmark and address, Defendants lead patients to believe that the bills they receive are from a local medical provider rather than a national hospital services conglomerate.[2]

## CO-CONSPIRATORS, FACILITATORS AND OTHERS

60.     Subsidiaries, divisions and affiliates within Defendants' corporate families provided or billed for, or assisted in the providing or billing of, emergency room services, played a material role in the scheme or conspiracy alleged in this complaint, and were active, knowing participants in the scheme or conspiracy alleged herein. Their conduct in making false claims to obtain monies from Real-Parties-in-Interest was known to and approved by their respective corporate parent Envision Healthcare.

61.     Subsidiaries, divisions and affiliates within Defendants' corporate families that provided or billed, or assisted in providing or billing, for emergency room services but did not have primary responsibility for submitting such claims are the beneficiary of the submission of a

---

[2] This pattern of aliases and multiple names also demonstrates that Defendants EmCare Holdings, Inc. and RTI are, in fact, doing business in California without registering with the Secretary of State in violation of California Corporations Code 2105(a).

1  false claim, who discovered or should have subsequently discovered the falsity of the claim, and

2  who failed to disclose the false claim to the relevant state or the political subdivision within a

3  reasonable time after such discovery.

4        62.    Plaintiff believes the Defendants, and each of them, were acting as agents and/or

5  employees of each other and doing each thing alleged herein or acting within the scope of such

6  agency.

7        63.    Various other unknown persons and entities have participated as co-conspirators

8  or facilitators, or have aided and abetted, counseled, commanded, induced or procured

9  Defendants' violations alleged herein and have performed acts and made statements to further the

10  scheme or conspiracy.  The Defendants are jointly and severally liable for the acts of such other

11  unknown persons and entities whether named or not named as Defendants.

12        64.    Whenever reference is made to any act of any entity herein, it is alleged that the

13  entity engaged in the act by or through its officers, directors, agents, managers, employees or

14  representatives while they were actively engaged in the management, direction, control or

15  transaction of the entities' business or affairs.

16        65.    Each of the Defendants named acted as the agent or joint-venturer of or for the

17  other Defendants regarding the acts, violations and common course of conduct alleged.  For

18  example, Envision's most recent Form 10K report explicitly uses the terms "we," "us," "our,"

19  "Envision" and the "Company" to "refer to the business of Envision Healthcare Corporation *and

20  its subsidiaries*." (emphasis added).  With implicit reference to the operations of its subsidiary

21  EmCare, Envision's Form 10K states, "As of December 31, 2016, Envision had physician

22  services contracts, many of which pertained to emergency department and hospitalist services,

23  covering more than 1,500 clinical departments in healthcare facilities in 45 states and the District

24  of Columbia, and over 23,100 employed or affiliated physicians and other healthcare

25  professionals.  Arizona, California, Florida, New Jersey and Texas accounted for approximately

26  64% of its physician services segment net revenue."  Envision, again with implicit reference to

27  its subsidiary EmCare, proclaims itself the "leading national provider of emergency medicine

28  services to hospitals and other facilities in the United States."

66.     Envision's Form 10K report goes on to state "we perform substantially all of the billing for our employed and affiliated physicians and employ a billing staff of approximately 1,400 employees.   Additionally, we have invested in several applications that provide the foundation for the day-to-day operations of our physician services business, including facilities-based billing and office-based billing."   Under certain of its agreements with hospital customers, Envision and its affiliates "bill patients and third party director[ies] for physician fees," and in some cases the hospital pays "an additional pre-arranged fee for ... services." *Id.*

67.     "Defendant Envision maintains control of its physician services segment through the use of Professional Corporations (PCs)," which "are captive in nature as a majority of the outstanding voting equity instruments of the PCs are owned by nominee vs. appointed at [Envision's] sole discretion." *Id.* Envision has "exclusive responsibility for the provision of all non-medical services required for the day-to-day operation and management of the PCs and ha[s] established guidelines for the employment and compensation of the physicians and other employees of the PCs, which is consistent with the operation of our wholly owned subsidiaries." *Id.*

68.     In line with these statements and admissions, courts have found that Envision Healthcare is an alter ego of EmCare, Inc. and EmCare Holdings, Inc. *See Winn & Assocs., PLLC v. EmCare Physician Providers, Inc.*, 2014 U.S. Dist. LEXIS 98548, *24 (E.D. Okla. July 21, 2014) ("EmCare Physician Providers, Inc., is the alter ego of Defendants EmCare, Inc., EmCare Holdings, Inc., and Envision Healthcare Holdings, Inc., and [] those named Defendants should be held liable for Defendant EmCare Physician Providers, Inc.'s breach ...").

69.     Envision and EmCare are also alter ego companies of, or at a minimum exhibit significant control over, their wholly owned coding and billing subsidiary RTI.   Envision's internal policy documents related to billing practices explicitly apply to "Envision Healthcare and its subsidiaries (the "Company")."   Those policies state they apply to "each of EmCare's billing entities including, but not limited to, Reimbursement Technologies Inc. (RTI)."

1  **V.    CLAIMS FOR RELIEF**

2                         **FIRST CLAIM FOR RELIEF**
                          **KNOWINGLY CAUSING FALSE CLAIMS TO BE PRESENTED**
3                         **(31 U.S.C. § 3729(a)(1)(A)) *(Against All Defendants)***

4        70.    Plaintiff incorporates by reference the allegations in paragraphs 1 – 69, inclusive,

5   as though set forth fully herein.

6        71.    By engaging in the conduct set forth herein, Defendants have knowingly presented

7   and caused to be presented false or fraudulent claims for payment or approval by the United States

8   of America in violation of 31 U.S.C. § 3729(a)(1)(A).

9        72.    As a result of Defendants' conduct alleged herein, the United States, through CMS

10  and other federally funded programs, has suffered substantial actual damages believed to be more

11  than hundreds of millions of dollars.

12                        **SECOND CLAIM FOR RELIEF**
                          **FALSE STATEMENTS OR RECORDS**
13                        **(31 U.S.C. § 3729(a)(1)(B)) *(Against All Defendants)***

14       73.    Plaintiff incorporates by reference the allegations in paragraphs 1 – 72, inclusive,

15  as though set forth fully herein.

16       74.    By engaging in the conduct set forth herein, Defendants have knowingly caused

17  to be made or used, false records or statements material to false or fraudulent claims, within the

18  meaning of 31 U.S.C. § 3729(a)(1)(B).

19       75.    As a result of Defendants' conduct alleged herein, the United States, through CMS

20  and other federally funded programs, has suffered substantial actual damages believed to be more

21  than hundreds of millions of dollars, in addition to losses sustained by other federally funded

22  programs.

23                        **THIRD CLAIM FOR RELIEF**
                          **CALIFORNIA FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS**
24                        **(Cal. Govt. Code §12651 (a)(1)) *(Against All Defendants)***

25       76.    Plaintiff incorporates by reference the allegations in paragraphs 1 – 75 inclusive,

26  as though set forth fully herein.

27

28

                                          22

77.     By engaging in the conduct set forth herein, Defendants have knowingly presented and caused to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Govt. Code §12651 (a)(1).

78.     As a result of Defendants' conduct alleged herein, the United States, through CMS's funding for Medi-Cal, and the State of California, through its funding for Medi-Cal, have suffered substantial actual damages of millions of dollars.

**FOURTH CLAIM FOR RELIEF**
**CALIFORNIA FALSE CLAIMS ACT: USING FALSE STATEMENTS TO GET FALSE CLAIMS PAID**
**(Cal. Govt. Code § 12651 (a)(2)) *(Against All Defendants)***

79.     Plaintiff incorporates by reference the allegations in paragraphs 1 – 78, inclusive, as though set forth fully herein.

80.     By engaging in the conduct set forth herein, Defendants have knowingly caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of Cal. Govt. Code § 12651 (a)(2).

81.     As a result of Defendants' conduct alleged herein, the United States, through CMS's funding for Medi-Cal, and the State of California, through its funding for Medi-Cal, have suffered substantial actual damages of millions of dollars.

**FIFTH CLAIM FOR RELIEF**
**CALIFORNIA FALSE CLAIMS ACT**
**(Cal. Govt. Code § 12651 (a)(8)) *(Against All Defendants)***

82.     Plaintiff incorporates by reference the allegations in paragraphs 1 – 81, inclusive, as though set forth fully herein.

83.     To the extent it was not directly involved in making, using, or submitting the false claims set forth herein, by its admitted involvement in its subsidiaries' business, Defendant parent company Envision Healthcare Corp. has been the beneficiary of the submission of a false claim, discovered or should have discovered the falsity of the claim, and failed to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

84.     To the extent it was not directly involved in making, using, or submitting the false claims described, by its admitted involvement in its subsidiaries' business, Defendant EmCare

1   Holdings, Inc. and EmCare Inc. have been the beneficiaries of the submission of a false claim,

2   discovered or should have discovered the falsity of the claim, and failed to disclose the false claim

3   to the state or the political subdivision within a reasonable time after discovery of the false claim.

4         85.     As a result of Defendants Envision Healthcare Corp., EmCare Holdings, Inc. and

5   EmCare Inc.'s conduct alleged, the United States, through CMS's funding for Medi-Cal, and the

6   State of California, through its funding for Medi-Cal, have suffered substantial actual damages

7   believed to be millions of dollars.

8                                         **PRAYER**

9        **WHEREFORE**, Plaintiff demands judgment in its favor against Defendants as follows:

10        1.     Judgment for the United States and the State of California, as applicable, against

11   each Defendant in an amount equal to three times the damages the federal government and State

12   of California have sustained because of the Defendants' actions, plus a civil penalty of up to

13   $21,563 for each violation of the FCA and up to $11,000 for each violation of the CFCA;

14        2.     An award to the Relator of the maximum allowed under federal and state law;

15        3.     For an award of costs and attorneys' fees as permitted by law;

16        4.     For such other and further relief as the Court deems just and proper.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

**JURY DEMAND**

2      Plaintiff demands a trial by jury on all issues so triable as a matter of right.

3

4   DATED: March 22, 2018

5

6

7      **KESSELMAN BRANTLY STOCKINGER LLP**
       DAVID W. KESSELMAN (State Bar No. 203838)
8      *dkesselman@kbslaw.com*
       AMY T. BRANTLY (State Bar No. 210893)
9      *abrantly@kbslaw.com*
       MAJED DAKAK (State Bar No. 271875)
10     *mdakak@kbslaw.com*
       MARK PALUCH (State Bar No. 229202)
11     *mpaluch@kbslaw.com*
       1230 Rosecrans Avenue, Suite 690
12     Manhattan Beach, CA 90266
       Telephone:    (310) 307-4555
13     Facsimile:    (310) 307-4570

14

15     **MOGINRUBIN LLP**
       Daniel J. Mogin (State Bar No. 95624)
16     *dmogin@moginrubin.com*
       Jennifer M. Oliver (State Bar No. 311196)
17     *joliver@moginrubin.com*
       600 W. Broadway, Suite 3300
18     San Diego, CA 92101
       Telephone:    (619) 687-6611
19     Facsimile:    (619) 687-6610

20

21     *Attorneys for Relator GREGORY J. DUNCAN, M.D.*

22

23

24

25

26

27

28